# UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION

|  |  |
|---|---|
| THE LEE S. KOSBY TRUST Derivatively on Behalf of WELBILT, INC., <br><br> Plaintiff, <br><br> v. <br><br> HUBERTUS M. MUEHLHAEUSER, JOHN O. STEWART, HARESH SHAH, CYNTHIA M. EGNOTOVICH, DINO J. BIANCO, JOAN K. CHOW, THOMAS D. DAVIS, TIMOTHY J. FENTON, BRIAN R. GAMACHE, ANDREW LANGHAM AND JANICE L. FIELDS, <br><br> Defendants, <br> -and- <br><br> WELBILT, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff, the Lee S. Kosby Trust ("Plaintiff"), by its attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Welbilt, Inc. ("Welbilt" or the "Company") against present and former the members of its board of directors (the "Board") and present and former members of senior management. The wrongdoing alleged herein has caused substantial damage to Welbilt's reputation, goodwill, and standing in the business community and exposed Welbilt to substantial, potential liability for violations of federal securities law.

2.      Welbilt is a commercial foodservice equipment company that designs, manufactures, and supplies food and beverage equipment for the global commercial foodservice industry. Welbilt offers customers operator and patron insights, collaborative kitchen solutions, culinary expertise and implementation support and service. The Company operates 21 manufacturing facilities throughout the Americas, Europe and Asia and sells through a global network of 5,000 distributors and dealers in over 100 countries.

3.      Welbilt was finally compelled to disclose that for years it suffered from numerous material weaknesses in its internal controls over financial reporting. In November 2018, the Company disclosed: (i) errors related to the computation of income taxes associated with a foreign subsidiary in connection with a 2008 acquisition; (ii) errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the same entity; (iii) ineffective internal controls over financial reporting and disclosure controls and procedures for income taxes; (iv) improper recording of intercompany transactions; and (v) ineffective controls over cash disbursements at the Crem International Holding AB ("Crem") business.

4.      The Company admitted when disclosing these shortcomings that it did not design and maintain effective internal controls over its accounting for income taxes and that certain

control functions over the completeness and accuracy of accounting for the income tax effects of certain transactions were not performed on a timely basis or otherwise appropriately.

5.      In March of 2019, the Company further disclosed that its internal controls were inadequately designed and poorly implemented concerning overseeing statements of cash flows.

6.      The consequences of the Company's internal control weaknesses were major. Specifically, the Company's 2016 consolidated financial statements were restated, and its 2015 and 2017 consolidated financial statements were revised.

7.      These failures resulted in the Company taking numerous though belated steps to remediate myriad control and reporting deficiencies. These remedial actions should have been implemented before and at the latest during the period from February 21, 2017 to present ("the relevant period"), during which time the Company repeatedly falsely reassured investors that its internal controls were adequate.

8.      Following the disclosure of the restatement, the Company's share price stock declined significantly, by approximately 26.19%, or $5.06 per share, from $19.32 per share on November 2, 2018, to close at $14.26 on November 5, 2018, on abnormally high trading volume with over 8.5 million shares traded on November 5, 2018.

9.      As detailed herein and in the federal securities class actions pending in this district styled *The Metropolitan Transportation Authority Defined Benefit Pension Plan Master Trust et al. v. Welbilt, Inc., et al.,* Case 8:18-cv-03007-JSM-AEP, the officers and directors greatly damaged Welbilt by causing it to file false and misleading statements that omitted to reveal material adverse facts concerning the Company's true state of financial affairs especially its Directors' total failure to ensure compliance with accounting standards.

10.     Indeed, the record during the relevant time period evidences that the Company's

Audit Committee, discussed and defined below, was derelict in performing the most rudimentary oversight functions.  In fact, it appears that the Audit Committee consciously ignored its mandate under its operative charter exposing it to the substantial risk of liability and the Company to significant damage.  Accordingly, demand on the Board would be futile and wasteful.

## JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. §1331 and Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 14(a) of the Exchange Act and SEC Rule and 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

12.     This Court has jurisdiction over each Defendant named herein because each is either a corporation that conducts business in and maintains operations in this District or is an individual with sufficient contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Welbilt maintains its principal place of business in this District; (ii) one or more of the Defendants either resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Welbilt, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.     Plaintiff, the Lee S. Kosby Trust is, and has continuously been, a stockholder of Welbilt during the time of the wrongdoing complained of herein.

15.     Nominal Defendant Welbilt is incorporated in Delaware and maintains its principal place of business at 2227 Welbilt Boulevard, New Port Richey, Florida 34655. Welbilt's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WBT." On March 3, 2017, the Company changed its name from Manitowoc Foodservice, Inc. to Welbilt, Inc.

16.     Defendant Hubertus M. Muehlhaeuser ("Muehlhaeuser") was Welbilt's Chief Executive Officer ("CEO") and President, and a Director until August 31, 2018 when he resigned. According to the Company's 2019 Proxy, he owns 154,366 shares of common stock.  He was paid approximately $8.9 million for his services to the Company in 2017 and 2018. Following his service at Welbilt, he joined CNH Industrial as President and CEO.

17.     Defendant John O. Stewart ("Stewart") was the Company's Chief Financial Officer ("CFO") and Senior Vice President until April 28, 2017, the effective date of his resignation as CFO. He was paid approximately $1.6 million for his services to the Company in 2017.

18.     Defendant Haresh Shah ("Shah") was the Company's CFO and Senior Vice President effective from May 1, 2017 through to 2019. Prior to being appointed CFO in May 2017, Defendant Shah served as the Vice President Corporate Controller and Chief Accounting Officer. In March 2019, Welbilt announced Defendant Shah's resignation, effective April 7, 2019. According to the Company's 2019 Proxy, he owns 22,598 shares of common stock. He was paid approximately $2.5 million for his services to the Company in 2017 and 2018.

19.     Defendant Cynthia M. Egnotovich ("Egnotovich") has served as chairperson of the Board of Directors and chairperson of the Corporate Governance Committee since March 2016.

According to the 2019 Proxy, she owns 102,097 shares of common stock.  She received $687,961 for her services to the Company in 2017 and 2018.

20.     Defendant Dino J. Bianco ("Bianco") has served as chairperson of the Audit Committee, a member of the member of the Compensation Committee, and a director since 2015. According to the 2019 Proxy, he owns 23,856 shares of common stock.  He received $413,488 for his services to the Company in 2017 and 2018.

21.     Defendant Joan K. Chow ("Chow") has served as chairperson of the Compensation Committee, member of the Corporate Governance Committee and as a Director since 2012. According to the 2019 Proxy she owns 34,878 shares of common stock. She received $412,488 for her services to the Company in 2017 and 2018.

22.     Defendant Thomas D. Davis ("Davis") has served as a member of the Audit Committee, member of the Compensation Committee and a Director since 2016. According to the 2019 Proxy he owns 18,942 shares of common stock. He received $381,988 for his services to the Company in 2017 and 2018.

23.     Defendant Timothy J. Fenton ("Fenton") served as a Director of the Company until April 28, 2017. He received $194,577 for his services to the Company in 2017.

24.     Defendant Brian R. Gamache ("Gamache") has served as a Director, member of the Audit Committee and member of the Compensation Committee since March 2017. According to the 2019 Proxy he owns 19,823 shares of common stock. He received $356,148 for his services to the Company in 2017 and 2018.

25.     Defendant Andrew Langham ("Langham") has served as a member of the Corporate Governance Committee, member of the Audit Committee and Director since 2016. According to the 2019 Proxy he owns 18,942 shares of common stock. He received $386,488 for

his services to the Company in 2017 and 2018.

26.     Defendant Janice L. Fields ("Fields") has served as a member of the Compensation Committee, a member of the Corporate Governance Committee and a Director since 2018. According the 2019 Proxy, she owns 3,443 shares of common stock. She received $128,191 for her services to the Company in 2018.

27.      Defendants Muehlhaeuser, Stewart, Shah, Egnotovich, Bianco, Chow, Davis, Fenton, Gamache, Langham and Fields are herein collectively referred to as the "Individual Defendants."

28.     During the relevant period, the Individual Defendants were officers and or directors overseeing Welbilt's operations and finances and made or authorized the materially false and misleading statements described herein. The Individual Defendants had intimate knowledge about core aspects of Welbilt's financial and business operations. The Individual Defendants also made decisions regarding disclosures that would be made by Welbilt.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

29.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Welbilt and its stockholders, fiduciary obligations of trust, loyalty, good faith, and due care, and was/is required to use his utmost ability to control and manage Welbilt in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Welbilt and its stockholders, to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

30.     Each Individual Defendant owed and continues to owe Welbilt, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company and in the use and preservation of its property and assets.

31.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Welbilt, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Welbilt, each of the Director Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

32.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

> (a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

> (b)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

> (c)     remain informed as to how Welbilt conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

> (d)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**DUTIES PURSUANT TO THE COMPANY'S CODE OF CONDUCT, CORPORATE GOVERNANCE GUIDELINES AND COMPLIANCE POLICY**

33.     The Individual Defendants, as officers and/or directors of Welbilt, were also bound by the Company's Code of Conduct[1] (the "Code of Conduct"), Corporate Governance Guidelines[2] and the Compliance Policy[3] which set out guiding principles concerning employee and business conduct. In particular, the Code "identifies those behaviors that are illegal, contrary to company policy or inconsistent with our values."

34.     The Code of Conduct states "to maintain our reputation, the company places a high priority on ensuring that our commitment to integrity is demonstrated in all our financial systems, business records, books of account and disclosures. Employees are required to meet the requirements as specified in Welbilt's Financial Reporting Accountability and Accounting Procedures Policy and Required SEC Filings and Disclosures Policy."

35.     The Welbilt Compliance Policy "applies to all employees and directors of the Company to provide a means for them to disclose in a safe and confidential manner any concerns they may have regarding accounting, internal accounting controls and auditing matters relating in any way to the Company."

**The Audit Committee and its Charter**

36.     In addition to these duties, Board members who served on the Audit Committee owed specific duties to Welbilt under the Audit Committee Charter (the "Audit Charter")[4] which provides the purpose of the Audit Committee is to "assist the Board of Directors in fulfilling its

---

[1] *See* Welbilt Code of Conduct:
http://s21.q4cdn.com/325629665/files/doc_downloads/2019/04/Welbilt-Code-of-Conduct-v-2019-(1).pdf
[2] See Welbilt Corporate Governance Guidelines:
 http://s21.q4cdn.com/325629665/files/doc_downloads/2018/WBT-Corporate-Governance-Guidelines-(2018-07-23)-FINAL.PDF
[3] See Welbilt Compliance Policy:
http://s21.q4cdn.com/325629665/files/doc_downloads/211_Complaints-Regarding-Accounting-or-Auditing-Matters.pdf
[4] *See* Audit Committee Charter at:
http://s21.q4cdn.com/325629665/files/doc_downloads/2019/06/WBT-Audit-Committee-Charter-04-07-16.pdf

oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, (4) the performance of the Company's internal audit function and independent auditors, and (5) the risks across the organization and the management and/or mitigation of those risks; and (6) prepare the report that SEC rules require be included in the Company's annual proxy statement."

37.     Defendants Bianco, Davis, Gamache, and Langham are herein referred to as the "Audit Committee Defendants" where it is appropriate to do so.

38.     The Audit Charter provides the Audit Committee Defendants' duties and responsibilities with regard to financial reporting include:

> Review and discuss with management the Company's annual audited financial statements and quarterly financial statements, including all footnotes, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."; Review (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the Company's independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and (d) the matters required to be discussed with the Company's independent auditor by the Statement on Auditing Standards No. 61; Review and discuss earnings press releases (paying particular attention to any use of "pro-forma," or "adjusted" non GAAP, information), as well as financial information and earnings guidance provided to analysts and rating agencies. (This may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and the Audit Committee need not discuss in advance each earnings release or each instance in which a company may provide earnings guidance.); Discuss policies with respect to risk assessment and risk management. This discussion should include a discussion of the Company's major risks (of whatever nature) and the steps that Company management has taken or is taking to monitor and manage those risks within acceptable levels; Review and evaluate from time-to-time the Company's process for managing and mitigating those Company risks assigned by the Board to the Audit Committee for review and evaluation; Discuss with Company management, the Company's director of internal

audit, and the Company's independent auditors, the Company's internal controls and the Company's disclosure controls and procedures, including the quarterly and annual assessments of such controls and procedures required by applicable laws, rules and regulations; See that the Company maintains an active internal audit function; approve the annual budget for the Company's internal audit function; review and discuss the annual plans for the scope of the activities to be undertaken by the internal auditors and the results of those internal audit activities; and review the staffing of the Company's internal audit function, and in particular, review and approve the appointment, performance and, if applicable, replacement of the Company's director of the internal audit function; Meet at least annually with management, independent auditors and those responsible for the internal audit function in separate sessions to discuss any matters that the Audit Committee or any of these groups believe should be discussed separately; Prepare an annual report of the Audit Committee to the Company's shareholders as required by applicable laws, rules and regulations; Provide oversight and guidance with respect to the policies, practices, and strategies that relate to the management of the financial affairs of the Company, including, without limitation, the following as requested by the Board: • Review for and recommend to the Board policies that maintain and improve the financial health and integrity of the organization. • Review and recommend to the Board the long-range financial plan for the organization. • Review and recommend to the Board an annual operating budget and annual capital budget consistent with the long-range financial plan and financial policies. • Review and recommend to the Board capital expenditures and unbudgeted operating expenditures that exceed management's spending authority. • Review and approve capital expenditures and unbudgeted operating expenses that, per Board-approved policy, are above management's authority but below the threshold required for Board approval. • Review the financial aspects of major proposed transactions, new programs and services, as well as proposals to discontinue programs or services, and making action recommendations to the Board. • Monitor the financial performance of the Company as a whole and its major subsidiary organizations or business lines against approved budgets, long-term trends, and industry benchmarks. • Require and monitor corrective actions to bring the Company into compliance with its budget and other financial targets. • Review and recommend to the Board policies governing investments and pension plans. • Approving the selection of independent investment advisers and managers. • Review reports from independent investment advisers and managers or reports from management summarizing the investment advisers and managers' reports. • Review and report to the Board annually on investment and benefit plan performance. • Review and recommend the Company's dividend policy. • Review and recommend policies and guidelines relating to the Company's capital structure and strategy, including the capital allocation strategy (including the cost of capital). • Review polices and guidelines regarding derivatives. • Review periodically, the Company's investor relations program and function.

**Breaches of Duties**

39.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Welbilt, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

40.     The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to revenue recognition practices. The Director Defendants also breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Welbilt to incur substantial damage.

41.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Welbilt's public statements and internal control function.

42.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Welbilt, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the securities class action that alleges violations of federal securities laws. As a result, Welbilt has expended, and will continue to expend, significant sums of money.

## THE INDIVIDUAL DEFENDANTS CAUSED HARM TO THE COMPANY

43.     On February 21, 2017, the Company stated that on February 16, 2017, Defendant Stewart, the Company's CFO, would retire effective April 28, 2017.  The only explanation given for the sudden announcement was that "John and I have decided that with the spin-off successfully completed and the groundwork laid for the next stage of our journey, now is the right time for John

to retire from MFS/Welbilt," according to Muehlhaeuser. Muehlhaeuser further stated that. "[Stewart] was instrumental to our successful spin-off. He has built a fantastic team and his leadership has been an invaluable help to me as we raised our debt, communicated our story to investors and dealt with all the challenges of being a new public company."

44.     On February 24, 2017, the Company filed a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC, reporting the Company's 2016 financial results. The 2016 10-K represented that the Company's internal controls over financial reporting were effective as of December 31, 2016. Individual Defendants Muehlhaeuser, Stewart, and Shah signed and certified the 2016 10-K under the Sarbanes-Oxley Act of 2002 attesting to the accuracy of the financial statements, effectiveness of internal controls, and that everything required was properly disclosed ("SOX Certifications"). Under Item 9A, Controls and Procedures, bearing the title "Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures," Defendants Muehlhaeuser and Stewart certified that:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2016, the end of such period, our disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, within the time periods specified in the Commission's rules and forms, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

45.     In the 10-K, informed shareholders about specific the steps they caused the

Company to take to enhance internal financial and accounting controls:

> Prior to the Spin-Off, we relied on certain financial information and resources of MTW to manage aspects of our business and to report financial results. These included investor relations, corporate communications, certain accounting, tax, legal, human resources, benefit plan administration, benefit plan reporting, general management, real estate, treasury, insurance and risk management, and oversight functions, such as the Board and internal audit, which includes Sarbanes-Oxley compliance. In connection with the Spin-Off, **we enhanced our own financial, administrative, and other support systems. We are expanding our internal accounting, reporting, legal and internal audit departments and have updated our policies and systems, as needed, to meet all regulatory requirements on a stand-alone basis**. We will continue to review, document and test our internal control over financial reporting, and may from time to time make changes aimed at enhancing their effectiveness and to ensure that our systems evolve with our business. These efforts may lead to changes in our internal control over financial reporting. There were no changes in our internal control over financial reporting during the quarter ended December 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.[5]

46.     On April 28, 2017, the Board appointed Defendant Shah to serve as Senior Vice President and CFO of the Company, effective May 1, 2017, replacing Stewart In the Company's Form 8-K filed on May 4, 2017, the Company disclosed to shareholders Defendant Shah's qualifications, including that he joined the Company as Vice President, Corporate Controller and Chief Accounting Officer in June 2016, his seven years of prior experience in financial leadership roles at multiple companies, and additional qualifications for the role.

47.     On May 9, 2017, the Company filed a Form 10-Q for the quarter ended March 31, 2017 ("Q1 2017 10-Q") with the SEC, reporting the Company's first quarter 2017 financial results

---

[5] All emphasis is added unless otherwise denoted.

and stated that the Company had effective internal controls over financial reporting as of March 31, 2017. It further stated that Defendant Stewart's retirement date had been extended from April 28, 2017 to May 5, 2017. Defendants Shah and Muehlhaeuser signed and certified SOX certifications attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

48.     On August 9, 2017, the Company filed a Form 10-Q for the quarter ended June 30, 2017 ("Q2 2017 10-Q") with the SEC, reporting the Company's second quarter 2017 financial results and stated that the Company maintained effective internal controls over financial reporting as of June 30, 2017. Defendants Shah and Muehlhaeuser signed and certified the Q2 2017 10-Q with SOX Certifications attesting to the accuracy of the financial statements, effectiveness of internal controls, and that all fraud was disclosed.

49.     On November 7, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 ("Q3 2017 10-Q") with the SEC, reporting the Company's third quarter 2017 financial results and stated that the Company maintained effective internal controls over financial reporting as of September 30, 2017. Defendants Shah and Muehlhaeuser signed and certified the Q3 2017 10-Q with SOX Certifications.

50.     On March 1, 2018, the Company filed a Form 10-K for the year ended December 31, 2017 ("2017 Form 10-K") with the SEC, reporting the Company's 2017 financial results and stated that the Company maintained effective internal controls over financial reporting as of December 31, 2017. Defendants Shah and Muehlhaeuser signed and certified the 2017 10-K with SOX Certifications. Defendant Muehlhaeuser was the CEO and Defendant Shah was CFO at the time the 2017 Form 10-K was filed with the SEC.

51.     The Company's 2017 Form 10-K also included the Management's Report on

Internal Control Over Financial Reporting, which stated, *inter alia*, that:

> Under the supervision and with the participation of the Company's Chief Executive Officer and Chief Financial Officer, management carried out an **evaluation of the effectiveness of the Company's internal control** over financial reporting as of December 31, 2017, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control— Integrated Framework (2013) (the "2013 framework"). Based on that evaluation, management concluded that, as of December 31, 2017, the Company's internal control over financial reporting was **effective**.

52.    On April 19, 2018, the Company expanded into hot beverage equipment and its geographic presence in Europe and Asia by acquiring Crem from Avaj International Holding AB for approximately $224 million.

53.    On May 8, 2018, the Company filed a Form 10-Q for the quarter ended March 31, 2018 ("Q1 2018 10-Q") with the SEC, reporting the Company's first quarter 2018 financial results and stated that the Company maintained effective internal controls over financial reporting as of March 31, 2018. Defendants Shah and Muehlhaeuser signed and certified the Q1 2018 10-Q with SOX Certifications.

54.    On August 9, 2018, the Company filed a Form 10-Q for the quarter ended June 30, 2018 ("Q2 2018 10-Q") with the SEC, which provided the Company's second quarter 2018 financial results and positions and further stated that the Company's internal control over financial report was effective as of June 30, 2018. The Q2 2018 10-Q was signed and certified by Defendants Shah and Defendant Muehlhaeuser with SOX Certifications.

55.    Defendants Muehlhaeuser and Shah stated the following regarding the Crem acquisition and its effect on the Company's internal controls over financial reporting:

> The Company completed the acquisition of Crem on April 19, 2018. SEC guidance permits management to omit an

assessment of an acquired business' **internal control over financial reporting from management's assessment of internal control over financial reporting for a period** not to exceed one year from the date of the acquisition. Accordingly, management has not assessed Crem's internal control over financial reporting as of June 30, 2018. Excluding the acquisition, **there was no change in our internal controls over financial reporting** (as defined in Rule **13a-15(f)** of the Exchange Act) that occurred during the period covered by this Quarterly Report on Form 10-Q **that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting**. The Company is in the process of integrating Crem into its existing control procedures from its date of acquisition. The Company does **not** anticipate the integration of the acquired company to result in changes that would materially affect its internal control over financial reporting.

56. The statements in ¶ 43-55 above were materially false and misleading because they misrepresented and failed to disclose the following adverse facts regarding the Company's business which were known to all Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that: (i) Welbilt lacked effective internal controls over financial reporting; (ii) Welbilt incorrectly recorded the tax basis of a foreign subsidiary and incorrectly amortized that subsidiary's intangible assets; and (iii) as a result of the foregoing, Defendants' statements about Welbilt's business were false and misleading and/or lacked a reasonable basis.

57. Furthermore, the Company had not, as of that date: (i) implemented adequate control procedures for the review, analysis and reporting of its income tax accounts, including control procedures relating to the income tax effects of non-routine transactions and intercompany obligations; (ii) engaged an external consulting firm to review and recommend additional control enhancements; (iii) required the separation of execution and approval of payments as well as conducting employee training for the Crem business; (iv) performed sufficiently frequent reviews of payables entries and bank statements; (v) updated the authorized signatories over banking

activities to increase oversight of banking and lending relationships to better safeguard cash; (vi)

increased the frequency of review and analysis over cash disbursements; (vii) implemented new

and enhanced internal control activities as to the review of exchange rate changes on cash; (viii)

implemented control activities over the review of the completeness and accuracy of data related to

the cash receipts on beneficial interest in sold receivables for accurate accounting treatment and

presentation; (ix) enhanced procedures over the review of the classification of transactions; (x)

completed a detailed risk assessment of the tax processes; (xi) identified additional or modified

internal controls necessary to ensure completeness and accuracy of accounting for the income tax

effects of non-routine transactions and intercompany obligations; or (xii) ensured that impacts of

additional guidance changes to the Tax Cut and Jobs Act are reviewed with the appropriate level

of precision.

58.     Instead, the Company would be forced to implement each of the remedial measures

set forth above in subsequent reporting periods.

59.     On March 14, 2018, the Company filed its 2018 Proxy Statement with the SEC.

Defendants Egnotovich, Bianco, Chow, Davis, Gamanche and Langham solicited the 2018 Proxy

Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material

misstatements and omissions.[6]

60.     With respect to adherence to the Code of Conduct, the Proxy Statement stated the

following:

> We have adopted a written Code of Conduct and a Global Ethics Policy that apply to all of
> our employees and directors and reflect our commitment to operate our business in a
> manner that meets the highest ethical standards. These policies are posted on the Investor

---

[6]     Plaintiff's allegations with respect to the misleading statements in the 2018 and 2019 Proxy Statement are
based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of
the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any
allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness about
these allegations and related claims.

Relations section of our website at http://ir.welbilt.com.

61.     With respect to the Audit Committee's function, the Proxy stated "the purpose of the Welbilt Audit Committee is to (A) assist the Board of Directors in fulfilling its oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, (4) the performance of the Company's internal audit function and independent auditors, and (5) the risks across the organization and the management and/or mitigation of those risks; and (B) prepare the report that SEC rules require be included in the Company's annual proxy statement…the Audit Committee's responsibilities include… obtaining and reviewing, at least annually, certain reports from the independent registered public accounting firm relating to the firm's internal quality-control procedures and their most-recent internal quality-control review or peer review; reviewing and discussing with management our annual and quarterly financial statements and related disclosures and quarterly earnings press releases; discussing with management our policies with respect to risk assessment and risk management; discussing with Company management and the Company's independent auditors, internal controls over financial reporting, disclosure controls and procedures and the Code of Conduct;  preparing the annual audit committee report as required by applicable laws, rules and regulations."

62.     Regarding risk oversight, the Proxy provided, "RISK OVERSIGHT. Management is responsible for the day-to-day management of the risks we face, and the Board is responsible for the oversight of risk across the entire Company. This responsibility is administered more directly through the Audit Committee, as one of its stated purposes pursuant to its committee charter is to assist the Board in fulfilling its role in the oversight of the risk across the organization and the management and/or mitigation of those risks. To this end, the Audit Committee discusses

guidelines and policies with respect to risk assessment and risk management, which includes a discussion of the Company's major risks and the steps that management has taken or is taking to monitor and manage those risks within acceptable levels. Additionally, each committee reviews and evaluates the Company's process for managing and mitigating those Company risks assigned by the Board to such committee for review and evaluation, if any. The Board and its committees regularly receive information and reports from members of senior management on areas of material risk based on their respective areas of responsibility."

63.     With regards to the Audit Committee report for the year ended 2017, the Proxy confirmed "In connection with its function to oversee and monitor the financial reporting process of the Company, the Audit Committee has done the following: • reviewed and discussed the Company's audited financial statements for the fiscal year ended December 31, 2017 with the Company's management; • discussed with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, those matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 1301 (Communications with Audit Committees), and SEC Regulation S-X, Rule 2-07 (Communication with Audit Committee); and • received the written disclosures and the letter from PricewaterhouseCoopers LLP required by the applicable requirements of the Public Company Accounting Oversight Board, considered whether the provisions of non- audit services by PricewaterhouseCoopers LLP are compatible with maintaining    PricewaterhouseCoopers    LLP's    independence,    and    discussed    with PricewaterhouseCoopers LLP its independence. Based on the foregoing, the Audit Committee recommended to the Board that our audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2017."

64.     On March 13, 2019, the Company filed its 2019 Proxy Statement with the SEC.

Defendants Egnotovich, Bianco, Chow, Davis, Fields, Gamanche and Langham solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

65.   With respect to adherence to the Code of Conduct, the Proxy Statement stated the following:

> We have adopted a written Code of Conduct and a Global Ethics Policy that apply to all of our employees and directors and reflect our commitment to operate our business in a manner that meets the highest ethical standards. These policies are posted on the Investor Relations section of our website at http://ir.welbilt.com.

66.   With regards to the Audit Committee Report for the year ended 2018, the Proxy stated "In connection with its function to oversee and monitor the financial reporting process of the Company, the Audit Committee has done the following: • reviewed and discussed the Company's audited financial statements for the fiscal year ended December 31, 2018 with the Company's management; • discussed with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, those matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 1301 (Communications with Audit Committees), and SEC Regulation S-X, Rule 2-07 (Communication with Audit Committee); and • received the written disclosures and the letter from PricewaterhouseCoopers LLP required by the applicable requirements of the Public Company Accounting Oversight Board, considered whether the provisions of non- audit services by PricewaterhouseCoopers LLP are compatible with maintaining PricewaterhouseCoopers LLP's independence, and discussed with PricewaterhouseCoopers LLP its independence. Based on the foregoing, the Audit Committee recommended to the Board that our audited financial statements be included in our Annual Report on Form 10-K for the fiscal year ended December 31, 2018. Audit Committee."

67.   The 2018 and 2019 Proxy Statements, failed to disclose, *inter alia*, that: (i) Welbilt

lacked effective internal controls over financial reporting; (ii) Welbilt incorrectly recorded the tax basis of a foreign subsidiary and incorrectly amortized that subsidiary's intangible assets; and (iii) as a result of the foregoing, Defendants' statements about Welbilt's business were false and misleading and/or lacked a reasonable basis.

## THE TRUTH IS REVEALED

68.     During the very brief interim period between Defendant Muehlhaeuser's resignation as President and CEO and the appointment of William Johnson to replace him, interim President and CEO Josef Matosevic concluded that the Company maintained ineffective internal controls over financial reporting.

69.     Specifically, on November 5, 2018, prior to the opening of the markets, Welbilt filed a Form 8-K Current Report with the SEC announcing Non-Reliance on Previously Issued Financial Statements ("November 2018 Non-Reliance Form 8-K"). Therein, the Company stated:

> **NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW**
>
> On November 3, 2018, the Audit Committee of the Board of Directors of Welbilt, Inc. (the "Company"), after considering the recommendation of management and after consulting with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm ("PwC"), determined that the Company's previously issued consolidated financial statements as of and for the year ended December 31, 2016 and the related  report of PwC as it relates to such period as included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 **should no longer be relied upon because of prior period errors**. The errors primarily relate to the computation of income taxes associated with intercompany distributions by foreign entities and intercompany obligations in accordance with underlying agreements.
>
> During the third quarter of 2018, the Company identified errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the same entity.

**These errors, which related to a U.S. tax election made in connection with a 2008 acquisition, impacted the tax determinations of certain intercompany distributions between foreign subsidiaries, thereby resulting in an understatement of the U.S. tax liability**.

In addition, the Company discovered certain intercompany transactions were not recorded on a timely basis. While these transactions have no impact to the Company's consolidated pre-tax book income, they did result in an **incorrect recognition of income tax expense or benefit recognized in each applicable jurisdiction, thereby resulting in an understatement of the U.S. tax liability**.

Based on its preliminary assessment, the Company estimates the aggregate impact of these tax related errors, along with other previously identified errors that were recorded as out of period adjustments, on consolidated net earnings, calculated in accordance with accounting principles generally accepted in the U.S., to be as follows: decrease by approximately $1.0 million to $2.0 million for the year ended December 31, 2015, decrease by approximately $7.0 million to $9.0 million for the year ended December 31, 2016 and decrease by approximately $1.0 million to $2.0 million for the year ended December 31, 2017. Because the Company has not yet fully completed its review, the estimated impact set forth above is preliminary and subject to change.

70.     The disclosure detailed the impacted financial statements:

Company intends to file an amended Annual Report on Form10-K for the year ended December 31, 2017 (the "Form 10-K/A") as soon as practicable. The consolidated financial statements of the Company as of and for the year ended December 31, 2016 will be restated, and as of and for the years ended December 31, 2015 and 2017 **are expected to be revised**, in each case, to reflect the correction of these tax errors. In addition, certain other adjustments, previously determined to be immaterial, individually and in the aggregate, will also be corrected in the restated and revised consolidated financial statements included in the Form 10- K/A. All relevant footnotes to the consolidated financial statements in the Form 10-K/A will also be restated or revised to reflect the items discussed above. In addition, **all previously filed 2018, 2017 and 2016 quarterly information are expected to be revised**.

The Company has reassessed the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures in light of the errors described above. The Company has determined that **a material**

**weakness relating to income taxes existed as of December 31, 2017 and through September 30, 2018, and therefore the Company's internal controls over financial reporting and disclosure controls and procedures for income taxes were ineffective.** In addition, the Company will also **restate management's report** on internal control over financial reporting and its evaluation of disclosure controls and procedures (included in its Annual Report on Form 10-K for the fiscal year ended December 31, 2017) and will receive an **adverse opinion on the internal control over financial reporting as of December 31, 2017 from PwC. Since management has not completed its evaluation of the impact of the errors on its internal control over financial reporting, there can be no assurance that additional control deficiencies which represent material weaknesses will not be identified.** Further details and remediation plans will be included in the Form 10-K/A. The Audit Committee of the Board of Directors has discussed the matters disclosed in this *Item 4.02 with PwC.*

71.     According to the Company, a "material weakness" is "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis."

72.     With respect to the significant revelation, the Company issued the following press release:

> During the third quarter of 2018, the Company identified errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the same entity. These errors, **which related to a U.S. tax election made in connection with a 2008 acquisition**, impacted the tax determinations of certain intercompany distributions between foreign subsidiaries thereby resulting in an understatement of the U.S. tax liability. In addition, the Company discovered certain intercompany transactions were not recorded on a timely basis. While these intercompany transactions have **no impact to the Company's consolidated pre- tax book income, they do impact the income tax expense.** As management determined the impact of these and other previously identified errors to 2016 to be material, it is restating its 2016 financial results. Management is expecting to revise its financial statements for 2017 and 2015. In addition, all previously filed 2018, 2017 and 2016 quarterly information are expected to be revised.

The financial results included in this press release reflect the estimated impact of these restatements and revisions and should be considered preliminary. For reconciliations between previously reported and revised amounts relating to the periods presented in this release, refer to the tables appearing at the end of this press release under the heading "Revision of Prior Period Results." Additional information regarding the revisions will be included in the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2018.

As a result of the errors identified, **the Company has determined that a material weakness in its internal control over financial reporting related to accounting for income taxes exists**. Accordingly, the Company will restate management's report on internal control over financial reporting and its evaluation of disclosure controls and procedures (included in it Annual Report on Form 10-K for the fiscal year ended December 31, 2017) and will receive an **adverse opinion on the internal control over financial reporting as of December 31**, 2017 from PricewaterhouseCoopers LLP.

For more information, please see the Current Report on Form 8-K that the Company previously filed on November 5, 2018.

73.     As a result of this news, the price of the Company's stock declined, by approximately 26.19%, or $5.06 per share, from $19.32 per share on Friday, November 2, 2018, to close at $14.26 on Monday, November 5, 2018, on abnormally high trading volume with over 8.5 million shares traded on November 5, 2018.

74.     On the morning of the revelation of the Company's 2015-2018 revisions and restatement, the Company convened a call with analysts and investors to discuss the third quarter financial results.

75.     Neither the soon to be appointed CEO Johnson or Interim CEO Matosevic addressed the tax errors or record-keeping failures the Company previously disclosed, but rather focused on the growth in the third quarter's organic net sales and adjusted operating EBITDA, the Crem acquisition's contribution of inorganic growth, and increases to material cost inflation that

negatively impacted the Company's margins. CEO Matosevic concluded his remarks by emphasizing that "[t]his was the 13th consecutive quarter of year-over-year adjusted operating EBITDA improvement."

76.     Defendant Shah, as CFO, did address the identified errors. At the conclusion of his prepared remarks, he stated as follows:

> Before we move to Q&A, I need to call your attention to the Form 8-K that we filed earlier this morning. During **our third quarter closing procedures**, we've identified errors relating to tax that impact prior periods. Management has determined the impact on 2016 to be material, so we will be restating our 2016 financial results. Please refer to the 8-K for our complete statement. That concludes my comments. Operator, we will now open up the call for questions.

77.     During the Q&A, Rob Wertheimer, of Melius Research LLC ("Melius"), raised a question to Defendant Shah regarding the timing of the purported discovery of the errors. Their exchange, in pertinent part, was as follows:

> **Melius**: Okay. Thanks. And, Haresh, was there anything different in your **closing procedures** this quarter that caused the tax issue to pop up?"
>
> **Defendant Shah**: It is the further refinement of the **new** tax rules. And as you may know, in **September**, they published hundreds of pages more of guidance on clarity what we needed to do and that drove that review back for us.
>
> **Melius**: Perfect.
>
> Thank you.

78.     But Defendant Sha's explanation does not match with Accounting Standards Codification ("ASC") Topic 740, *Income Taxes*, whereby a company is required to recognize the effects of changes in tax laws and rates including any retroactive effects of changes in tax laws in the period in which the new legislation is enacted. *The Tax Cuts and Jobs Act of 2017* was enacted

December 2017. Therefore, that legislation would not have required the Company to restate or revise its 2015 or 2016 financial statements.

79.     Following the revelations, William Blair & Company ("WB") published a report entitled *All Progress Reversed: From Great Growth Story to Transition Story With Surprise Reset,* which included commentary and analysis on the Company's performance and identified the Company's announcement of the material weakness as one of the reasons that "caused the stock to melt down."

80.     On November 9, 2018, the Company filed a Form NT 10-Q "Notification of Inability to Timely File Form 10-Q" concerning the deadline to file their 10-Q for the quarterly period ended September 30, 2018. In its explanation for the "unexpected delays in filing," the Company referenced the November 2018 Non-Reliance Form 8-K, its intentions to file: (i) an amended Annual Report on Form 10-K for the year ended December 31, 2017 (the "Form 10-K/A"); restated consolidated financial statements for the year ended  December 31, 2016; and (iii) revised consolidated financial statements for the year ended December 31, 2015 to reflect the correction of these tax errors.

81.     On November 20, 2018, the Company filed the untimely Form 10-Q for the quarter ended September 30, 2018 ("Q3 2018 10-Q"), reporting the Company's third quarter 2017 financial results and an Amended Form 10-K/A for the year ended December 31, 2017 (the "2017 Form 10- K/A"). The 2017 Form 10-K/A's stated purpose was to restate the previously issued consolidated financial statements and related disclosures for the year ended December 31, 2016, as well as to revise the consolidated financial statements for the years ended December 31, 2017, and December 31, 2015.

82.     In both the Q3 2018 10-Q and the 2017 Form 10-K/A, the Company described the

principal errors in its previous financial statements using the same language from the November 5, 2018 Form 8-K, describing the errors as relating to internal record-keeping where "certain intercompany transactions were not recorded on a timely basis" and to the "the tax basis of a foreign subsidiary and incorrect tax amortization of the intangible assets held by the same entity." The net result of these errors related to a U.S. tax election made in connection with a 2008 acquisition and led to an understatement of the Company's U.S. tax liabilities.

83.     Notably, the Company chose to not provide any details to its investors regarding the "tax election," "intercompany transactions," "foreign subsidiary," or "intangible assets" that were referred to in the language above.

84.     In addition to the initially disclosed errors, the Company also stated that additional tax errors from the same period had been discovered. These additional errors were disclosed in the 2017 Form 10-K/A with the caveat that the errors were "included but not limited" to the below:

(a)     $2.7 million understatement of the loss incurred on early extinguishment of debt in 2016, which was initially identified and corrected for as an out-of-period correction in 2017;

(b)     $2.9 million of net tax errors that primarily originated prior to 2016 and would have increased net parent company investment prior to the Spin-Off, which were identified and initially corrected for as an out-of-period correction in 2016; and

(c)     In 2016, subsequent to the initial accounting for the Spin-Off, the Company incorrectly reduced the carrying value of deferred tax liabilities through a credit to retained earnings of $7.2 million. In 2017, the Company adjusted for this error through an out-of-period adjustment to additional paid-in capital, which then resulted in a misclassification between cumulative retained earnings and additional paid-in capital.

85.     In its 2017 Form 10-K/A, the Company disclosed that the combined impact of the tax errors disclosed on November 5, 2018, with the above additional errors, resulted in a $5.4 million net understatement of the Company's previously reported income tax expense in 2016, a 21.3% increase over the income tax expense amount originally reported. Moreover, the Company

disclosed revised earnings per share for 2016 that was 10.34% lower than originally reported.

86.     Although the above errors also impacted the Company's previously issued 2017 and 2015 financial statements, the Company made the assessment that the impact did not require a restatement. Thus, the Company opted to revise the 2015 and 2017 financial statements in the 2017 Form 10-K/A.

87.     In addition to the errors that had been disclosed on November 5, 2018, and in the 2017 Form 10K/A, the Company disclosed additional errors in the Q3 2018 10-Q that had not previously been disclosed. With the caveat that the Company's disclosure was "not limited" to the errors below, the Company revealed the following:

> **Cash flows misclassification** of $4.0 million related to withholding taxes associated with stock-based compensation has been revised as cash flows from financing activities instead of operating activities in the unaudited consolidated statement of cash flows for the nine months ended September 30, 2017; and
>
> b. $3.6 million and $4.5 million **understatement** of foreign currency translation adjustments in the three months ended March 31, 2017, and the six months ended June 30, 2017, respectively, related to the accounting for an interest rate swap contract, which was originally identified and corrected for as an out-of-period adjustment in the three months ended September 30, 2017.

88.     In the Q3 2018 10-Q, the Company disclosed that in order to fully reflect the above errors, it would make some revisions:

> …previously issued unaudited consolidated financial statements for the three and nine months ended September 30, 2017 in this Form 10-Q. The Company is also disclosing the impact of the revisions on the previously filed unaudited consolidated financial statements for the three months ended March 31, 2017 and the three and six months ended June 30, 2017. Additionally, the Company is disclosing the impact of the revisions on the previously unaudited consolidated financial statements for the three months ended March 31, 2018 and three and six months ended June 30, 2018.

> Unaudited financial statements for the three months ended
> March 31, 2018 and three and six months June 30, 2018 will
> be revised in connection with the future filing of the
> Company's Form 10-Q for the three months ended March 31,
> 2019 and the three and six months ended June 30, 2019.

**Misappropriation of Funds**

89.    The Company's Q3 2018 10-Q went on to disclose further evidence that the

Company's internal controls were recklessly mismanaged and relied upon – specifically at its

subsidiaries.

90.    In the Q3 2018 10-Q, the Company stated as follows:

> On November 14, 2018, management learned of an incident
> that occurred in early November 2018, which resulted in the
> diversion of approximately **€4.0 million** from a subsidiary of
> the Company's recently acquired Crem business. The
> Company is currently investigating this matter, including the
> potential likelihood of recovery, if any. Based on its
> preliminary review as of the date of this report, management
> believes **the loss, net of recoveries, to be approximately €1.0
> million to €3.0 million**, although this amount **may change** as
> the Company continues with its investigation. The Company
> also has disclosed the matter to local authorities and is
> cooperating with them in their investigation. The Company
> does not currently expect the impact of this incident to be
> material to its business, results of operations or financial
> condition.

91.    In its November 20, 2018, SEC filings, Company management explained how it

conducted an evaluation of the effectiveness of its internal controls over financial reporting as of

December 31, 2017. According to the 2017 Form 10K/A, this reassessment was performed under

the supervision of and with the participation of the Interim CEO Matosevic and Defendant Shah.

Ultimately, the Company concluded:

> …it did not design and maintain effective internal controls
> over the **accounting for income taxes**. Specifically, certain
> control activities over the completeness and accuracy of

accounting for the income tax effects of **(i) non-routine transactions and (ii) intercompany obligations in accordance with underlying agreements** were not performed **on a timely basis or at the appropriate level of precision**. These control deficiencies resulted in the **misstatement of the income tax accounts and related financial disclosures**, the restatement of the Company's consolidated financial statements for the year ended December 31, 2016 and the revision of the Company's consolidated financial statements for the years ended December 31, 2017 and 2015 and quarterly periods in 2017 and 2016. Additionally, these control deficiencies **could result in additional misstatements** of the aforementioned balances and disclosures that would result in a material misstatement to the Company's annual or interim consolidated financial statements that would not be prevented or detected.

92.   Additionally, the misappropriation of funds in connection with the Crem business demonstrated that as of September 30, 2018, the Company "did not maintain effective internal controls over cash disbursements at the Crem business, which was acquired in April 2018, allowing for the misappropriation of Company assets." Specifically, management determined that the same employee handled both the processing and the approval for payments of cash disbursements.

93.   The result of this material weakness in its internal controls led to the misappropriation of approximately €4.0 million. The Company went on to admit that generally speaking, such a control deficiency "could result in a misstatement of cash, accounts payable, earnings from operations and income tax accounts and disclosures that would result in a material misstatement to the interim or annual consolidated financial statements that would not be prevented or detected."

94.   In its 2017 Form 10K/A, the Company addressed its earlier, false statements regarding the effectiveness of disclosure controls and procedures as follows:

> Management has **reassessed** its evaluation of the effectiveness of its internal control over financial reporting as of December 31, 2017, **based on the framework established in Internal Control- Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).** As a result of that reassessment, management identified a material weakness and, accordingly, has concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2017…. In addition, the Company's independent registered public accounting firm has restated their report on the Company's internal control over financial reporting and **issued an adverse opinion**.

95.     The "reassessment" that led to the identification of a material weakness involving Interim CEO Matosevic (whose tenure as Interim CEO spanned no more than one financial quarter) and Defendant Shah, and the evaluation in the Company's original 2017 Form 10-K with Defendant CEO Muehlhaeuser and Defendant Shah, were both based on the same framework. As the Company stated in its original 2017 Form 10-K:

> Under the supervision and with the participation of the Company's Chief Executive Officer and Chief Financial Officer, management carried out an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2017**, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control—Integrated Framework (2013) (the "2013 framework").** Based on that evaluation, management concluded that, as of December 31, 2017, the Company's internal control over financial reporting was effective.

96.     In its 2017 Form 10-K/A, the Company outlined its "Remediation Plan" as follows:

> In response to the identified material weakness, management, with the oversight of the Audit Committee of the Board of Directors, will take comprehensive actions to remediate the material weakness in internal control over financial reporting, including:

- implementing **additional specific enhanced control procedures** for the **review, analysis and reporting** of its income tax accounts, including control procedures relating to the income tax effects of non-routine transactions and intercompany obligations; and

- engaging an **external consulting firm** to review and recommend additional control enhancements.

97. The Company further cautioned that it was "unlikely that management will have successfully remediated this material weakness in 2018 in consideration of the timing of when this material weakness was identified."

98. On February 19, 2019, the Company filed Form 8-K with the SEC to release the Company's earnings for the quarter and year ended December 31, 2018. The Company announced that it had identified certain errors in its previously issued consolidated financial statements as of and for the years ended December 31, 2016 and 2017 and in its 2017 and 2018 unaudited condensed consolidated quarterly financial statements. These errors were disclosed as follows:

    a.   A classification error related to a foreign short-term time deposit with an original maturity greater than three months was incorrectly classified as a cash and cash equivalent instead of a short-term investment. This error resulted in an overstatement in cash and cash equivalents and an understatement in short-term investments of $19.9 million and $18.7 million as of December 31, 2017 and December 31, 2016, respectively. The error also resulted in an overstatement in cash from investing activities of $18.7 million for the year ended December 31, 2016, and $14.3 million for each of the three months ended March 31, 2018, the six months ended June 30, 2018, and the nine months ended September 30, 2018.

    b.   A calculation error related to the adoption of Accounting Standards Update 2016-15 ("ASU 2016-15"), "Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments," in 2018. As required by ASU 2016-15, the Company retrospectively applied the impact of such

adoption to the corresponding 2017 periods in each of its 2018 Form 10-Q filings. Subsequent to the adoption and retrospective application of ASU 2016-15, an error was identified in the amount of previously reported cash receipts on beneficial interest in sold receivables. This error resulted in an overstatement (understatement) in cash flow from operating activities and the offsetting impact to investing activities of ($3.9) million and $5.8 million in the three months ended March 31, 2018 and 2017, ($20.9) million and $5.8 million in the six months ended June 30, 2018 and 2017, and ($43.4) million and $5.8 million in the nine months ended September 30, 2018 and 2017, respectively.

c.    A calculation error related to the effect of exchange rate changes which resulted in an overstatement of cash flows from operating activities of $16.2 million and $1.8 million for the years ended December 31, 2017 and December 31, 2016 on the statement of cash flows. This error also resulted in an overstatement of cash flows from operating activities of $8.8 million and $3.6 million for the three months ended March 31, 2018 and 2017, $3.3 million and $7.2 million for the six months ended June 30, 2018 and 2017, and $1.2 million and $14.0 million for the nine months ended September 30, 2018 and 2017.

99.    Even though the Company disclosed that these errors had "no effect" on the Company's consolidated statements of operations, comprehensive income or equity for any period previously discussed, the Company stated that it expected to disclose that its internal controls over disclosures and financial reporting were not effective as of December 31, 2018 and that it would receive an adverse opinion on internal controls from PricewaterhouseCoopers LLP ("PwC").

100.    On March 1, 2019, the Company filed its Form 10-K Annual Report with the SEC for the year ended December 31, 2018 ("2018 10-K"). In it, the Company confirmed that by its own evaluation the internal controls over disclosures and financial reporting were not effective as of December 31, 2018. The 2018 10-K included PwC's audit report containing an adverse opinion

on the Company's internal controls:

> Also in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control Integrated Framework* (2013) issued by the COSO because material weaknesses in internal control over financial reporting existed as of that date related to ineffective controls with respect to (i) risk assessment controls related to the design and operating effectiveness of the Company's internal control over financial reporting, (ii) accounting for income taxes, (iii) cash disbursements at the Crem business, and (iv) the presentation of the statement of cash flows.
>
> ***We have identified material weaknesses in our internal control over financial reporting which, if not timely remediated, may adversely affect the accuracy and reliability of our financial statements, and our reputation, business and the price of our common stock, as well as lead to a loss of investor confidence in us.***
>
> We are taking steps to remediate these material weaknesses. While we believe these steps will improve the effectiveness of our internal control over financial reporting and remediate the identified deficiencies, if our remediation efforts are insufficient to address the material weaknesses or we identify additional material weaknesses in our internal control over financial reporting in the future, our ability to record, process, summarize and report information required to be disclosed within the time periods specified by the rules and forms of the SEC and to otherwise comply with our reporting obligations under the federal securities laws and our long-term debt agreements will likely be adversely affected. The occurrence of, or failure to remediate, these material weaknesses and any future material weaknesses in our internal control over financial reporting may adversely affect the accuracy and reliability of our financial statements and have other consequences that could materially and adversely affect our business, including an adverse impact on the market price of our common stock, potential actions or investigations by the SEC or other regulatory authorities, possible defaults under our debt agreements, shareholder lawsuits, a loss of investor confidence and damage to our reputation.

101.    The Company also disclosed that the failure to design and maintain effective risk

assessment controls related to the design and operating effectiveness of the Company's internal

control over financial reporting, contributed to a failure to design and maintain effective internal

controls over the accounting for income taxes, a failure to maintain effective internal controls over

cash disbursements at the Crem business, and a failure to design and maintain effective internal

controls over the presentation of the statements of cash flows.

102.    These issues resulted in the revision of previously issued consolidated financial

statements for the years ended December 31, 2017 and 2016, for the quarterly periods in 2017 and

for the three months ended March 31, 2018, three and six months ended June 30, 2018 and three

and nine months ended September 30, 2018.

103.    On May 8, 2019, the Company filed its Form 10-Q for the first quarter of 2019

("Q1 2019 10-Q"). The Company stated as follows:

> Management carried out an evaluation, under the supervision
> and with the participation of our Chief Executive Officer and
> Chief Financial Officer, of the effectiveness of our disclosure
> controls and procedures (as such term is defined in Rules 13a-
> 15(e) and 15d-15(e) under the Exchange Act) as of the end of
> the period covered by this report. Based on such evaluation, our
> Chief Executive Officer and Chief Financial Officer have
> concluded that, **as of March 31, 2019,** due to the identification
> of material weaknesses in our internal control over financial
> reporting previously identified and reported in our 2018
> Annual Report on Form 10-K ("2018 Form 10-K") which, as
> described below, continue to exist, our disclosure controls and
> procedures were not effective.

104.    Welbilt reported having taken the following additional remediation steps during the

three months ended March 31, 2019:

> We developed and implemented new and enhanced internal
> control activities over review of the following with the
> statements of cash flows: (i) exchange rate changes on cash,
> (ii) completeness and accuracy of the cash receipts on
> beneficial interest in sold receivables for accurate accounting

treatment and presentation and (iii) classification of transactions, and

Through an external consulting firm, we have completed a detailed risk assessment of the tax processes and have begun refining the processes and identifying additional internal controls or modifying existing internal controls necessary to ensure risks are appropriately addressed.

105.    On August 7, 2019, the Company filed its Form 10-Q for the second quarter of

2019 ("Q2 2019 10-Q"). In its report on Controls and Procedures, the Company stated as follows:

Management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, **as of June 30, 2019**, due to the material weaknesses in our internal control over financial reporting previously identified and reported in our 2018 Annual Report on Form 10-K ("2018 Form 10-K") which, as described below, **continue to exist, our disclosure controls and procedures were not effective**.

106.    The Company reported having taken the following additional remediation steps

during the six months ended June 30, 2019. the Company reported the following concerning its

external consulting firm's risk assessment of the Company's tax processes:

Through the use of an external consulting firm, we completed a detailed risk assessment of the income tax processes. Based on the risk assessment, we identified additional or modified internal controls necessary to ensure (i) completeness and accuracy of accounting for the income tax effects of non-routine transactions and intercompany obligations in accordance with underlying agreements are performed on a timely basis and reviewed with the appropriate level of precision and (ii) impacts of additional guidance changes to the Tax Cut and Jobs Act are reviewed with the appropriate level of precision. We have refined the income tax processes to incorporate these enhanced internal controls, which were implemented during the second quarter of 2019.

**DERIVATIVE ALLEGATIONS**

107.    Plaintiff brings this action derivatively and for the benefit of Welbilt to redress injuries suffered, and to be suffered, because of the Director Defendants' breaches of their fiduciary duties as directors and/or officers of Welbilt, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

108.    Welbilt is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

109.    During the wrongdoing alleged herein, Plaintiff has been and remains a stockholder of Welbilt. Plaintiff will adequately and fairly represent the interests of Welbilt in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

110.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

111.    A pre-suit demand on the Board of Welbilt would have been futile and, therefore, is excused.  At the time of filing of this action, the Board consists of Director Defendants Egnotovich, Bianco, Chow, Davis, Gamache, Langham and Fields. Plaintiff need only allege demand futility as to a majority of Director Directors who were on the Board at the time this action was commenced.

112.    Demand is excused here because a majority of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.  Director Defendants Egnotovich, Bianco, Chow, Davis, Gamache, Langham and Fields solicited the false and misleading 2018 and 2019 Proxy statements.

113.   In complete abdication of their fiduciary duties, the Direct Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, inter alia, intended to make the Company appear more profitable and attractive to investors. Because of the foregoing, the Director Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**Audit Committee Defendants' Complete Lack of Oversight**

114.   Demand is otherwise futile with respect to the four members of the Audit Committee (the Audit Committee Defendant) during the relevant period (Bianco, Davis, Gamanche and Langham) because they face the risk of substantial liability stemming from their failure to oversee the Company's compliance with applicable accounting regulations despite their mandate to do so under the Audit Committee Charter and significant reason to know that accounting machinations were ongoing.

115.   The Audit Committee Defendants breached their fiduciary duties both by failing to maintain adequate accounting controls and by utilizing improper accounting and audit practices, leading to the Company's issuance of false and misleading statements requiring restatements and other adjustments.

116.   The Audit Committee Defendants' categorical failure to conduct any form of reasonable oversight is rendered crystal clear by admissions made by the Company in the context

of restatements and remedial action.

117.    The Audit Committee Defendants' failed to implement effective internal controls over financial reporting and disclosure controls and procedures for incomes taxes resulting in PricewaterhouseCoopers LLP ("PwC") issuing an adverse opinion on the internal control over financial reporting.

118.    The Audit Committee Defendants failed to exercise oversight over the computation of income taxes associated transactions with foreign entities.

119.    The Audit Committee Defendants failed to identify errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the entity.

120.    The Audit Committee Defendants failed to take the requisite steps to ensure intercompany transactions were recorded on a timely basis.  This failure resulted in the incorrect recognition of income tax expenses or benefits recognized in each applicable jurisdiction and an understatement of the Company's U.S. tax liability.

121.    According to PwC, the Company. by virtue of the Audit Committee's failure, did not maintain effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") because a material weakness in internal control over financial reporting existed as of that date related to the accounting for income taxes. Compliance with this mandate was the duty of the Audit Committee Defendants.

122.    The Audit Committee Defendants failed to ensure that non-routine transactions and intercompany obligations were accordance with underlying agreements. Its failure resulted in the misstatement of the income tax accounts and related financial disclosures, the restatement of the Company's consolidated financial statements for the year ended December 31, 2016 and the

revision of the company's consolidated financial statements for the years ended December 31, 2017 and 2015 and quarterly periods in 2017 and 2016.

123.     The Audit Committee Defendants failed to ensure that the Company maintained effective internal controls over cash disbursements at its recently acquired Crem business to prevent the misappropriation of Company assets.

124.     As evidenced by information disclosed in February 2019, the Audit Committee was derelict in its oversight duties with respect to the preparation of previously issued consolidated financial statements for the years ended December 31, 2017 and 2016 and in its 2018 and 2017 unaudited condensed consolidated quarterly financial statements.  This failure resulted in, among other maladies, a classification error related to a foreign short-term time deposits resulting in an overstatement in cash and cash equivalents and an understatement in short-term investments of $19.9 million and $18.7 million as of December 31, 2017 and December 31, 2016, respectively. The error also resulted in an overstatement in cash from investing activities of $18.7 million for the year ended December 31, 2016, and $14.3 million for each of the three months ended March 31, 2018, the six months ended June 30, 2018, and the nine months ended September 30, 2018.

125.     The Audit Committee Defendants did not put into place effective controls concerning possible calculation errors related to the adoption of Accounting Standards Update 2016-15  This error resulted in an overstatement (understatement) in cash flow from operating activities and the offsetting impact to investing activities of ($3.9) million and $5.8 million in the three months ended March 31, 2018 and 2017, ($20.9) million and $5.8 million in the six months ended June 30, 2018 and 2017, and ($43.4) million and $5.8 million in the nine months ended September 30, 2018 and 2017, respectively.

126.     Subsequent disclosures in 2019 further evidence that the Audit Committee

Defendants did not maintain effective internal control over financial reporting as of December 31, 2018. Specifically, the Audit Committee Defendants did not ensure that Company maintained effective risk assessment controls related to the operating effectiveness of internal control over financial reporting as of December 31, 2018.

127. The Audit Committee Defendants failed to maintain effective internal controls over cash disbursements at the Crem business, which was acquired in April 2018, allowing for the misappropriation of assets.

128. The Audit Committee Defendants failed to maintain effective internal controls over the presentation of the statements of cash flows.

129. Welbilt noted in its August 2019 quarterly report filed with the SEC, that the material weaknesses were not remediated as of June 30, 2019. *See* Q2 2019 10-Q.

**The Audit Committee was Confronted with Numerous Warnings**

130. The errors in Welbilt's financial controls over its accounting were massive. The errors occurred in myriad areas of the Company's business. They included failure to monitor the issuance of standard SEC filings to allowing Company's assets to be stolen. They were so massive that as of the time of the filing of this complaint the Company admits that it still unable to warrant that its internal controls are adequate.

131. The failures in oversight concerned tax issues, currency exchange rates, cash flow mischaracterizations, funds illegally diverted from subsidiaries, among other issues. Indeed, the Audit Committee's failure over internal controls span a broad array of accounting and tax areas (and PwC's finding of non-compliance) strongly militates in favor of a finding that the Audit Committee knew or should have known it was not performing its function. Here, the record demonstrates bad faith may be inferred where the records demonstrates that the directors knew or

should have known that unlawful conduct was taking place yet took no steps in a good faith effort to prevent or remedy that situation.

132.    The Audit Committee is tasked with ensuring that the Company enacts and complies with a detailed program of internal controls over accounting and financial reporting. Here, PwC has confirmed that the Directors, in particular the Audit Committee, failed in this duty. Indeed, according to PwC, the Company did not maintain effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO because a material weakness in internal control over financial reporting existed as of that date related to the accounting for income taxes. Compliance with this mandate was the duty of the Audit Committee Defendants.  It is wholly unreasonable for the Audit Committee Defendants not to have known that they were not complying with basic COSO standards to such a degree that PwC would be justified in issuing a material non-compliance opinion.

133.    That the Audit Committee was entirely derelict is further evidenced by Interim CEO Matosevic serving as the interim-CEO of Welbilt for only 2 months in the interim period between full-time CEOs when the errors were discovered and reported.

### Additional Considerations

### Non-Compliance with the Code of Conduct

134.    In violation of the Code of Conduct, the Director Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in an accounting scheme to issue materially false and misleading statements to the public and facilitate and disguise the Director Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code

of Conduct, the Directors failed to comply with the law. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

135.    Welbilt has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Welbilt any part of the damages Welbilt suffered and will continue to suffer. Thus, any demand upon the Directors would be futile. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Directors can claim exculpation from their violations of duty pursuant to the Company's charter.  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as futile.

136.    The acts complained of herein constitute violations of fiduciary duties owed by Welbilt's Director Defendants, and these acts are incapable of ratification.

**Insurance Considerations**

137.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Welbilt. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director

Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Welbilt, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

138.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Welbilt to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## DAMAGES TO WELBILT

139.    The improper accounting practices have exposed the Company to myriad reputation and financial damages, including but not limited to:

(a)  Restatements and goodwill impairments;

(b)  Liability arising from securities fraud litigation;

(c)  The loss of credibility with customers and suppliers; and

(d)  Legal and accounting costs associated with litigation, investigations and restatements.

140.    The foregoing damages can be specifically explicated considering the disclosures the Company had made concerning its Directors' failure to exercise oversight over the Company's accounting and financial practices.  Specifically, the Company's previously issued consolidated

financial statements as of and for the year ended December 31, 2016 and the related report of PwC as it relates to such period as included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 could no longer be relied upon because of prior period errors.

141.    The Company estimated the aggregate impact of the tax related errors, along with other previously identified errors that were recorded as out of period adjustments, on consolidated net earnings, calculated in accordance with accounting principles generally accepted in the U.S., to be as follows:

- Decrease by approximately $1.0 million to $2.0 million for the year ended December 31, 2015.

- Decrease by approximately $7.0 million to $9.0 million for the year ended December 31, 2016.

- Decrease by approximately $1.0 million to $2.0 million for the year ended December 31, 2017.

142.    The Company has suffered the misappropriation of corporate funds in the amount of approximately €4.0 million. The Company will also suffer under the weight of the misstatement of the income tax accounts and related financial disclosures, the restatement of the Company's consolidated financial statements for the year ended December 31, 2016, and the revision of the Company's consolidated financial statements for the years ended December 31, 2017 and 2015 and quarterly periods in 2017 and 2016.

143.    The Company has been damaged by a $5.4 million net understatement of its previously recognized income tax expense in 2016 resulting as a result of income tax errors, along with other prior period income tax errors previously corrected for as out-of-period adjustments in the period of identification.

144.    As a result of income tax errors and related restatements, the Company suffered a $2.7 million understatement of the loss incurred on early extinguishment of debt in 2016, which

was initially identified and corrected for as an out-of- period correction in 2017; a $2.9 million of net tax errors that primarily originated prior to 2016 and would have increased net parent company investment prior to the Spin-Off, which were identified and initially corrected for as an out-of-period correction in 2016; and in 2016, subsequent to the initial accounting for the Spin-Off, the Company incorrectly reduced the carrying value of deferred tax liabilities through a credit to retained earnings of $7.2 million.

145.   In 2017, the Company suffered damages by having to make as adjustment for this error through an out-of-period adjustment to additional paid-in capital, which then resulted in a misclassification between cumulative retained earnings and additional paid-in capital.

146.   The failure to conduct any meaningful oversight caused the Company to incorrectly reduce the carrying value of deferred tax liabilities through a credit to retained earnings of $7.2 million. In 2017, the Company adjusted for this error through an out-of-period adjustment to additional paid-in capital, which then resulted in a misclassification between cumulative retained earnings and additional paid-in capital.

147.   The failure to properly exercise accounting oversight resulted in cash flows misclassification of $4.0 million related to withholding taxes associated with stock-based compensation. The failure to exercise sufficient oversight, especially by the Audit Committee, resulted in the misstatement of the income tax accounts and related financial disclosures, the restatement of consolidated financial statements for the year ended December 31, 2016, the revision of consolidated financial statements for the years ended December 31, 2017 and 2015 and quarterly periods in 2017 and 2016.

148.   The failure to exercise sufficient oversight, especially by the Audit Committee, resulted in audit adjustment impacting income taxes as of and for the year ended December 31,

2018. Along with the revision of previously issued consolidated financial statements for the years ended December 31, 2017 and 2016, for the quarterly periods in 2017 and for the three months ended March 31, 2018, three and six months ended June 30, 2018 and three and nine months ended September 30, 2018.

149. The abject failure of the Audit Committee Defendants and other defendants exposed the Company material weaknesses in the Company's internal controls over financial reporting previously identified and reported in the 2018 Form 10-K, the Company's disclosure controls and procedures are not effective as of June 20, 2019. See Q2 2019 10-Q.

## FIRST CLAIM

### Against the Director Defendants
*for Violations of Section 14(a) of the Exchange Act*

150. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

152. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

153.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

154.    Under the direction and watch of the Director Defendants, the 2018 and 2019 Proxy Statements failed to disclose material adverse facts about Welbilt 's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) Welbilt lacked effective internal controls over financial reporting; (ii) Welbilt incorrectly recorded the tax basis of a foreign subsidiary and incorrectly amortized that subsidiary's intangible assets; and (iii) as a result of the foregoing, Defendants' statements about Welbilt's business were false and misleading and/or lacked a reasonable basis.

155.    The 2018 and 2019 Proxy Statements stated that the Company's directors and employees, including its principal executive officer, principal financial officer, principal accounting officer, and controller, or persons performing similar functions, are subject to the Company's Code of Conduct.   The 2018 and 2019 Proxy Statements were also false and misleading because, despite assertions to the contrary, Welbilt's Code of Conduct was not followed, as the Director Defendants made and/or caused the Company to make the false and misleading statements discussed herein.

156.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 and 2019 Proxy Statements were materially false and misleading. The misrepresentations

and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2018 and 2019 Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

157.    The false and misleading elements of the 2018 and 2019 Proxy Statements led to the re-elections of all of the Director Defendants which allowed them to continue breaching their fiduciary duties to Welbilt.

158.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2018 and 2019 Proxy Statements.

159.    Plaintiff on behalf of Welbilt has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.    The Individual Defendants, by virtue of their positions with Welbilt and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Welbilt and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Welbilt to engage in the illegal conduct and practices complained of herein.

162.    Plaintiff on behalf of Welbilt has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

164.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Welbilt's business and affairs.

165.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

166.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Welbilt.

167.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

168.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

169.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose: (i) Welbilt lacked effective internal controls over financial reporting;  (ii)  Welbilt incorrectly recorded the tax basis of a foreign subsidiary and incorrectly amortized that subsidiary's intangible assets; and (iii) as a result of the foregoing, Defendants' statements about Welbilt's business were false and misleading and/or lacked a reasonable basis.

170.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

171.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

172.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

173.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Welbilt has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

175.    Plaintiff on behalf of Welbilt has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants
*for Unjust Enrichment*

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Welbilt.

178.    The Individual Defendants either benefitted financially from the improper conduct or received unjust compensation tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Welbilt that was tied to the performance or artificially inflated valuation of Welbilt, or received compensation that was unjust in light of the Director Defendants' bad faith conduct.

179.    Plaintiff, as a stockholder and a representative of Welbilt, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Director Defendants due to their wrongful conduct and breach of their fiduciary duties.

180.    Plaintiff on behalf of Welbilt has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants
*for Waste of Corporate Assets*

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    As a further result of the foregoing, the Company will incur many millions of

dollars of legal liability and/or costs to defend unlawful actions, engage in internal investigations, and lose financing from investors and business from future customers who no longer trust the Company and its products.

183.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

184.    Plaintiff on behalf of Welbilt has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Director Defendant as follows:

a.    Declaring that Plaintiff may maintain this action on behalf of Welbilt, and that Plaintiff is an adequate representative of the Company;

b.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Welbilt;

c.    Determining and awarding to Welbilt the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

d.    Directing Welbilt and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Welbilt  and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines

of the Board; and

2. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

e. Awarding Welbilt restitution from Individual Defendants, and each of them;

f. Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 4, 2019

**CULLIN O'BRIEN LAW, P.A.**
CULLIN A. O'BRIEN
Florida Bar No. 597341

*/s/Cullin O'Brien*
CULLIN O'BRIEN

6541 NE 21st Way Ft. Lauderdale, FL 33308
Telephone: 561/676-6370 561/320-0285 (fax)
cullin@cullinobrienlaw.com

**LEVI & KORSINSKY, LLP**
Gregory Mark Nespole
Samir Shukurov
LEVI & KORSINSKY, LLP
55 Broadway, 10th Floor
New York, New York 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
gnespole@zlk.com
shukurov@zlk.com

*Attorneys for Plaintiff*